WHEELER, J.,
dissenting. I fully coincide in opinion with tlie court upon tlie first question presented in argument. I regard the original petition and tlie amendments as constituting one pleading or petition. For the purpose of considering the demurrer, every averment well pleaded must be taken to bo true ; but at the same time every allegation is to he taken most strongly against tlie party making it. And I take it to be quite too clear for argument that the plaintiff must be held to his express admission that the defendant, previous to the time mentioned, had always resided out of the limits of this State.
But. upon the second point, the effect of this non-residence upon tlie plaintiff’s right to sue under the saving- provision of tlie twenty-second section of the act of limitations, I find myself constrained to differ in opinion with the majority of tlie court. I regard the law upon this question as settled upon too linn a basis of uniform and enlightened adjudications to lie now questioned. 'This will, I think, be sufficiently apparent by a brief reference to a few of the adjudged cases.
In the case of Ruggles v. Keeler (3 Johns. R., 264) tlm question was raised upon tlie construction of tlie proviso in tlie statute of Row York, which was adopted from the statute of Anne, and of which onrs is ft substantive enactment. and underwent the scrutiny of that pre-eminently learned and enlightened court of which Kent was t hen Chief .1 ustice. The. English autlioril ies were reviewed by the Chief Justice with his usual great ability and learning, and a .conclusion was arrived at the opposite of that at which this court lias *59 arrived in the case now decided. “ Whether the defendant be a resident of this State, and only absent for a time, or whether lie resides altogether out of the State, (said the Chief Justice,) is immaterial. He is equally within the proviso. If the cause of action arose out of the State, it is .sufficient to save the statute from running in favor of the party to he charged until he comes within ■our jurisdiction. This lias been tiie uniform construction of the English statutes, which also speak of ‘the return’ from beyond the seas of tiie party so •‘absent.’ The word ‘return’ has never been construed to coniine tiie proviso to Englishmen who went abroad occasionally. The exception has been considered as general, and as extending equally to foreigners who reside always abroad. This was evidently the opinion of Lord Talbot in case of Duplein v. De Rover. (2 Vern., 540.) In Strithorst v. Greame, (3 Wils. R.. 145, 2 Black. R., 732, S. C.,) the point was so ruled by the court of C. B. in England.”
The rule as here stated has been reasserted and affirmed by the Supreme Court of the United States, and also by State courts, in numerous decisions. (3 Wheat. R., 541; 11 Wheat. R., 361; 14 Mass. R., 203; 11 Pick. R., 36; Ang. Lim., 214-216, and notes.)
Thus, at the period when our statute was enacted, the signification of the words employed in tiie saving clause of the twenty-second section had been judicially determined. Must not the Legislature be supposed to have adopted those words with tiie meaning' which had thus been attached to them by judicial construction ? Is it reasonable to suppose that they intended the application to this section of tiie statute of a different rule here from that which a known judicial construction had given to the same language elsewhere?
“Tiie American acts of limitations,” says Mr. Angelí, “as they relate to personal actions of every kind, are either an exact transcript of the statute of Janies or a revision and modification of it, and that the mere change of phraseology in tiie revision of a statute before in force will not work an alteration in the law previously declared, unless it indisputably appears that such was the intention of the Legislature, has been expressly decided.” (Ang. Lim., 17.)
“If tiie periods of limitation be different in different countries or States and dn different actions, yet, as the statutes are drawn with slight variations of phrase, and all being in pari materia, the object and intention being the same, they require a uniform construction.” (Per Abbott, Ch. J., 5 B. & Aldr., 204.)
To tiie same effect is the language of Mr. Justice Story in the case of Sherwood v. Sutton, (5 Mass. C. C. R., 149.) And in Pennock & Sellers v. Dialogue (2 Pet. R., 18) the same learned judge says: “It is doubtless true, as has been suggested at tiie bar, that when English statutes, such, for instance, as the statute of frauds and the statute of limitations, have been adopted in our legislation, the known and settled construction of those statutes liy courts of law has been considered as silently incorporated into tiie acts or has been received with all the weight of authority.”
So, in Kirkpatrick et al. v. Gibson's Executors, (2 Brock. C. C. R., 391,) Chief Justice Marshall said: “I am the more inclined to this opinion because it is reasonable to suppose that when a British statute is re-enacted in this country, we adopt tiie settled construction it lias received, as well as the statute itself; and such I believe to have been the course of the court in every Slate of the Union.” And-again, in Cathcart et al. v. Robinson. (5 Pet. R., 280.) the same eminent judge said: “The rule which lias uniformly been observed by this court in construing statutes is to adopt the construction made by the courts of tiie country by whose legislation the statute was enacted.” “The received construction,” &c., “may very properly be considered as accompanying the .statutes themselves and forming an integral part of them.”
This undoubtedly is the doctrine universally recognized. (1 Pick. R., *60 154; 5 Mass. R., 517; 3 Id., 511; 2 Id., 475; 3 Pick. R., 517; 2 Day. R., 276.). The reasonableness of this rale of construction, and the universality of its reception in common-law countries, with the sanction of the great names I have mentioned, would seem sufficient to commend it to our adoption without the support of a further reference to authorities.
To return, then, with this doctrine in view to the construction which has-been given to the section of our statute in question in our sister States from which the statute was borrowed.
In the ease of Estis v. Rawlins (5 How. Mi. R., 265) the court quote the twelfth section of their statute in these words: “ If any person or persons against whom there is or shall be cause of action,” &c., ‘'shall be out of this State at the time of such action accruing, or any time during which a suit might be sustained on such cause of action, then the person or persons who is or shall be entitled to such action shall be at liberty to bring the same against such person or persons after his or their return into this State; and the time-of such person’s absence shall not be accounted or taken as a part of the time-limited by this act.” After remarking that but for the word “ return” in the latter part of the section there could be no difficulty as to its construction, and that there can be no good reason for allowing that to control and limit the previous broad and unequivocal enactment, adverting to the reason of the rule and the authorities by which it is supported, the court proceed to say “The reason and justice of the enactment apply as well to those who have not been in the State at all as to those who have not been in it since the cause of action accrued. It was evidently intended that the remedy should not be barred until there had been ample time and opportunity to enforce it under the laws of the State. Until the defendant came within the jurisdiction of our courts there was no such opportunity. The only remedy in this case was by personal action. 'That did not exist until the defendant was subject to llie jurisdiction of the látate courts; and, of course, it could not be barred until it had an existence. The savings in the English statutes of 21st James I and 4th Anne, both as to plaintiffs and defendants who were abroad when the cause of action accrued, have been held to apply as well to those who had never been in England as to those who had left before the cause of action accrued. And such also lias been the construction in most of the Slates of the Union.” (Per Sharkie, Chief Justice.)
This is but a reiteration of the views which have prevailed universally wherever similar statutes have existed. They were adopted in the earliest decisions upon the statute, both in England and the United States. They not only stand uncontradicted, but they have received affirmatively tiie fullest and strongest sanction. (16 Pick. R., 359; 3 Mass. R., 271; 1 Pick. R., 263; 3 Gill. & J., 158; 2 McC. R., 331; 1 Stew. & P. R., 36; 3 Pike Arks. R., 409; 7 Missouri R., 241, 243; 1 Greene Iowa R., 9, 11; Ang. Lim., 214-216, and notes.)
The language of numerous decisions of the courts of other States, to the same effect as that extracted from the opinions in Ruggles v. Keeler and Estis v. Rawlins, might be quoted, but these references will suffice to show that the present is not a new or an open question. It will be seen from them that the rule that the saving in the 22d section of the statute applies no less to foreigners than citizens was first settled upon the construction of the English statutes from which ours is derived by courts amongst the most enlightened that adorn the history of our jurisprudence; and that in this construction they have been followed down to the present time with a unanimity of opinion and adjudications scarcely ever equaled upon any other subject.
IVe have the uniform decisions of the English courts, without a single case or opinion or even dictum to the. contrary; we have the unanimous opinions of the Supreme Courts of Massachusetts and Mew York; we have the do- *61 •visions of the Supreme Court of the United States; we have those of the courts •of New Hampshire, Connecticut, Rhode Island, Pennsylvania, Virginia, South ■Carolina, and Georgia; and, lastly, we have those of Ohio, Kentucky, Alabama, Mississippi, Arkansas, Missouri, and Iowa, and, I believe, I might safely say of nearly if not quite every State in the Union, (see eases cited above,) and •there is nothing to oppose this unbroken current of authorities.
The rule was laid down in Lord Talbot’s day as the then recognized and ■established law, and it has never been departed from to the present time. There is not a doctrine or principle or maxim in the whole magnificent structure of our municipal jurisprudence which rests upon a firmer or a sounder basis. It has become the undoubted construction and uncontroverted law, re- • cognized for a series of years and by numerous courts; adopted, repeated, reiterated, and confirmed by the most enlightened judges that have ever presided in courts of justice.
And to all this are we not asked, I with deference submit, to oppose a conclusion drawn from the literal meaning of a single word which occurs in the section in question, and by a criticism upon the meaning of this one word, to •control the broad and unequivocal language of the whole antecedent portion of the section, as though this word, in the same connection, had not long since received a judicial construction; as though our own Legislature had not, to.gether with the statute, adopted the construction upon it by the English and American courts, and thus made the construction as- obligatory upon us as the .statute itself; and, in a word, as though no weight was to be given to adjudged •cases, and no respect due to the highest judicial and, in my view, even legislative authority?
“Who ever heard,” said Chancellor Kent in the celebrated case of Yates v. The People, (6 Johns. R., 420,) “who ever heard of expounding a statute by reading one line only? ” But are we not asked, I with deference submit, not to expound a statute merely, but to overturn all the adjudged cases by a conclusion drawn from the literal import of a single word, a mere grammatical criticism, making the case turn upon a technicality of etymology — a •mere question of philology?
I will not descend from the “vantage ground” of high adjudications to a ■criticism upon the literal signification'of words long since construed by the sages of the law. I disclaim' the idea that our Legislature intended a construction of the language they employed different from that which had uniformly 'been given to the same language elsewhere. Had that been their intention, they would certainly have declared that intention.
To the supplemental act I attach no consequence in the consideration of this question. To my mind it is perfectly clear that the supplement was intended only as the declaration of a general principle, applicable generally to the provisions of the statute respecting money demands, but not especially to control ■and annul this particular provision. I cannot conceive that the Legislature •could liave intended, by a supplement inferring in general terms to the act of limitations, to give a construction or declare the rule, not in reference to the ■statute thejr mention, but merely in reference to a proviso and exception in ■the act. Can it be that by the words “the act of limitations” they meant, not '• indeed the general provisions of that act, but a mere exception contained in its •22d section? I cannot perceive any rational foundation for such a supposition. ■On the contrary, it does seem to me that to indulge it is to suppose the Legislature to have been incapable either of perceiving the import of their own language, or else of employing language appropriate to convey their meaning. Had they intended to declare a rule of construction for the 22d section alone, ■they would certainly have expressed that intention. Had they meant to apply ■to that section a different rule here from that adopted, judicially determined, ■and applied to the same language elsewhere, they would have employed *62 language appropriate 'to convey that meaning. 3Tot having- done so, but having used language which applies equally to every provision of* the statute prescribing the time"within which actions upon contracts must be brought, it is, it seems to me, most clear that they meant only to declare the rule of construction to be applied to the statute in general, and to no one section in particular.
And they did this out of abundant caution, lest the courts might hold that the statute would not otherwise operate to bar the right of action upon contracts made abroad, or claims held by foreigners while the holders were not subject to the influence of our laws — a doctrine recently contended for here in argument.
It is proposed to effectuate the real intention of the Legislature; and can it be that they actually intended to legislate for the exclusive benefit of foreigners, and to place them upon more favorable grounds than our own citizens? For it is admitted that if the defendant had been a citizen and had gone abroad temporarily, the statute would not have run in his favor during his absence. Can it be that it was really intended to give to foreigners a legal advantage that was denied to citizens?
To give effect to a statute is not necessarily to make it introductory of a new rule. If it were so, there could not beany such thing as a declaratory statute. Legislation does not necessarily imply change. Its legitimate province is as well to restore the common law as render certain what may be thought doubtful, and to insure uniformity of decision as to remedy existing imperfections or to innovate upon the established order of things.
It is the well-settled rule to construe statutes in reference to and in conformity with existing laws. “For it is not to be presumed,” says Chancellor Kent, “that the Legislature intended to make any innovation upon the existing law further than the ease absolutely required. This has boon the language of the courts in every age ; and when we consider the constant, vehement, and exalted eulogy which the ancient sages bestowed upon the common law as the perfection of'reason and the best birthright and noblest inheritance of the subject, we. cannot be surprised at the great sanction given to this rule of construction.” (1 Kent, 464.)
Without entering upon a discussion respecting the reasonableness of the adjudications or intending to resort to the argwmentwm ad absurdum, I may be permitted to advert to one consequence of the new construction, which is that a debtor residing in a State where the period of limitation is double that of our law, when the period of the law of his domicile shall have but half elapsed, may abscond to this State, and his legal liability and the plaintiff’s right of action will be effectually and forever barred the moment the absconding debtor comes within the influence of our laws; and this though his creditor be a citizen of this State. Can it bn supposed that the Legislature ever intended such a consequence? that it was actually intended that the plaintiff’s right of action should be barred in our courts before it ever liad au existence ? Can the imputation of such an intention be, with justice, cast upon the Legislature when they have provided the emigrant with an effectual shield against “stale demands.” by allowing him to plead the act of limitations of the State from, which he emigrated in bar of the action here? (5 Stat., 166, sec. 13.) The (‘migrant is thus protected as far as may be compatible with the sense of justice! which, we must suppose, actuated the Legislature without the necessity of resorting to this construction.
To all that may be said in commendation of the policy of statutes of limitation, when rightly understood and construed in furtherance of the legislative intention, and the principles of right and justice, I accord a cheerful assent. But I cannot yield my assent to doctrines and views which, in my opinion, overturn the well-settled principles of the law, defeat the clear manifestations of the legislative will, and are opposed to the prevailing construction of the most enlightened courts of our own country, and the universally received *63 sense of the profession, from which are derived the lights by which the courts themselves must be guided in their determination.
That tiie construction to which I adhere has not arisen from any disfavor to statutes of limitation in general is, I thiuk, sufficiently apparent from the authorities to which I have referred, where it is made to rest, not upon any slavish, blind adherence to precedent and authority, but upon what the courts-have considered the well-ascertained intention of the Legislature and the only just interpretation of the statutes themselves.
And when it is borne in mind that it is the universally received doctrine in common-law countries that when one State or nation adopts the written laws-of another it will be deemed to have adopted along with those laws the known construction placed upon them by the courts of the country from which they were derived, and that that construction becomes as much a part of the law of the land as the statutes themselves, and when it is further borne in mind that courts are constituted to expound, not to make the law, and that it is their-province “to administer the law as they find it,” I cannot entertain a doubt as to what construction and rule of decision ought to be adopted on the present occasion.
The doctrine of the binding force of precedents (says Chancellor Kent) has been insisted on by the most eminent jurists and the most enlightened courts.
And he quotes and approves the exceedingly forcible language upon this-subject of that great man and eminent jurist, Sir William Jones, whose exalted genius explored and fathomed almost every branch of legal and political science, and, indeed, of human knowledge, who said, “No man who is not a lawyer would know how to act, and no man who is a lawyer would, in many instances, know what to advise, unless courts were bound by authority as firmly as the Pagan deities were supposed to be bound by the decrees of fate.”'
Although, in my opinion, the construction of the statute which has hitherto prevailed, and to which I adhere, is based upon reason as well as authority, and is not less certainly supported by the one titan the other, it would at least-be superfluous if not even presumptuous in me to enter upon a formal vindication of the reasonableness of a series of adjudications so numerous, and' proceeding from sources of so high authority. And if, in my conception, it did admit of doubt as to wiiat construction ought originally to have prevailed, if I may be permitted to adopt the language and the sentiment of Mr. Justice Baldwin on the occasion of an inquiry not unlike the present, “It sufficed for this case to show by a brief reference what the law for more than a century has been and now is, without ever so far departing from what I deem my judicial duty as to even inquire what it ought- lo be ; as if it was in my power to-abrogate or vary from its rules on this or any other subject. Where a point is decided by adjudged cases, or laid down as settled in the books of acknowledged authority, I take it and feel bound to act upon it as the common law, which is infused into our jurisprudence, unless some act of the Legislature or some decision of this court prescribes another rule. When this court declares that ‘ we are entirely content to administer the law as we find it,’ I feel bound to endeavor to find, and when found, to follow it in all its course. And in searching among the fountains rather than the rivulets of the law for its true principles, I apprehend there can be no safer guide than its precedents and adjudications, which, from ancient times, have embodied and preserved unchanged those principles which time has consecrated by the certainty of the-law, and the security and repose which an adherence to its rule affords to the rights of property and person.” (14 Pet. R., 626.)
Finally, (in the language of Chancellor Kent, 6 Johns. R., 436,) “If the Gordian knot is to be cut, we ought at least to call for the dignus vindice nodus* There ought to be an object befitting so bold a precedent.” In the present -case there is nothing which should disturb the tranquil course of the law* *64 T am unable to perceive in it any considerations oí justice or sound policy which in the least call for a departure from precedent and authority.
Note 17. — Love v. Doak & Tims, post, 343; Moore v. Hendrick, 8 T., 253. A new rule of limitation was introduced by the act of 16th of February, 1852, (Paschal’s Dig., arts. 4,618 to 4,620;) and the statute is suspended until twelve months after the removal of the debtor to this State, if an action on the claim was not barred by the law of the State from which he emigrated before his removal. (Thompson v. Berry, 26 T., 263.)